**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION**

Crown Battery Manufacturing Co.,  Case No. 3:12CV2158

    Plaintiff

    v.  **ORDER**

Club Car, Inc.,

    Defendant

This is a dispute regarding the type of contract plaintiff Crown Battery Manufacturing Company (Crown) entered into with defendant Club Car, Inc. (Club Car or CCI). Crown argues Club Car breached a requirements contract that obligated Club Car to purchase batteries from Crown. Club Car contends there was no breach of contract because the contract was not a requirements contract, and it had no obligation under the contract to purchase anything from Crown.

Pending is Club Car's motion for partial summary judgment. (Doc. 29).

For the reasons that follow, I grant defendant's motion.

**Background**

Having discussed the facts in an earlier decision, *Crown Battery Co. v. Club Car, Inc.,* 2013 WL 5670950 (N.D. Ohio), , I recite only the facts relevant to this motion.

In September, 2009, Crown entered into the contract at issue, denominated as the Strategic Supply Agreement (SSA), to provide batteries for Club Car's golf carts and utility vehicles.

1

Beginning in January, 2010, per the SSA, Crown was manufacturing over 12,000 batteries each week. Crown delivered the batteries to its warehouse, from which Club Car would take batteries as needed.

> Regarding the quantity of batteries, the SSA provides:
>
> Quantity Obligation.  CROWN agrees to sell and timely deliver Products to CCI at its designated location as set forth in individual purchase orders or blanket orders (each and "Order") accepted by CROWN throughout the Term of this Agreement in the quantity requirements that will be communicated through CCI's Supplier Advantage supplier interface system ("Supplier Advantage") with real-time updates (EDI System). It is understood by the Parties that, commencing January 15, 2010, CROWN shall manufacture not less than twelve thousand (12,000) units of Product during each calendar week for the Term of the Agreement. CCI shall have the first right of refusal for the first such twelve thousand (12,000) units each week. If CCI does not place an Order with respect to any portion of such weekly twelve thousand (12,000) units at least four weeks prior to such week ("Declined Volume"), Crown is free to sell the Declined Volume to another customer. The Parties further agree to review CROWN's capacity capabilities from time to time during the Term. In times when Crown is unable to supply all of its customers' requirements at the same time, CROWN agrees to use its best efforts to supply CCI's requirements, but in no event shall it supply CCI with more than its pro rata portion of any given Product as determined by CCI's total annual spend vis-a-vis that specific Product by Crown's other customers. No quantity obligations shall be imposed upon CCI unless specifically detailed in the attached Exhibit A; provided, however, in no event shall any such obligations be in effect during a period in which CROWN has been issued a Notice to Cure or Notice of Termination.

(SSA ¶ 2(B), Doc. 29-2, at 2-3).

In early 2011, Club Car told Crown that Crown batteries were failing in its golf carts because they were not holding charges. In May, 2011, Club Car tendered hundreds of customer-submitted warranty claims for defective batteries. Crown refused to honor the claims, contending that the on-board charging systems (OBCs), not its batteries, were defective.

As of October, 2011, Club Car was purchasing 5,000 to 7,000 batteries weekly. In November, 2011, Club Car told Crown it would no longer use Crown's batteries for its "Precedent"

2

vehicle line. Club Car's purchases dropped from an average of only 800 batteries per week in January, 2012, to no batteries by March, 2012.

Club Car's pending motion for partial summary judgment, seeks dismissal of Count Two of Crown's complaint. Count Two alleges that Club Car breached the SSA when it sent Crown notice that it would no longer purchase Crown batteries.

## Standard of Review

A party is entitled to summary judgment on motion under Fed. R. Civ. P. 56 where the opposing party fails to show the existence of an essential element for which that party bears the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The movant must initially show the absence of a genuine issue of material fact. *Id*. at 323.

Once the movant meets that initial burden, the "burden shifts to the nonmoving party [to] set forth specific facts showing there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56(e)). Rule 56(e) "requires the nonmoving party to go beyond the [unverified] pleadings" and submit admissible evidence supporting its position. *Celotex*, *supra*, 477 U.S. at 324.

In deciding a motion for summary judgment, I accept the opponent's evidence as true and construe all evidence in the opponent's favor. *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 456 (1992). The movant can prevail only if the materials offered in support of the motion show there is no genuine issue of a material fact. *Celotex*, *supra*, 477 U.S. at 323. "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Scott v. Harris*, 550 U.S. 372, 380 (2007).

## Discussion

Under New York law, which the parties agree controls the SSA, I must "give effect to the intent of the parties as revealed by the language of their agreement." *In re Coudert Bros.*, 487 B.R. 375, 389 (S.D.N.Y. 2013) (citing *Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 232 F.3d 153, 157 (2d Cir. 2000)). If the terms of a written contract are clear and unambiguous, I must find the intent of the parties "within the four corners of the contract, giving a practical interpretation to the language employed and the parties' reasonable expectations." *Howard v. Howard*, 740 N.Y.S.2d 71, 71 (N.Y. App. Div. 2002).

When analyzing the contract's text, I "need not turn a blind eye to context." *Coudert*, *supra*, 487 B.R. at 389. Rather, I should "accord [contractual] language its plain meaning giving due consideration to 'the surrounding circumstances [and] apparent purpose which the parties sought to accomplish.'" *Thompson v. Gjivoje*, 896 F.2d 716, 721 (2d Cir. 1990) (citation omitted). Ultimately, I must enforce a "written agreement that is clear, complete and subject to only one reasonable interpretation . . . according to the plain meaning of the language chosen by the contracting parties." *Acumen Re Mgmt. Corp. v. Gen. Sec. Nat'l Ins. Co.*, 2012 WL 3890128, *5 (S.D.N.Y.) (citation omitted).

I interpret ambiguous terms in a contract against the drafter. *Nocella v. Fort Dearborn Life Ins. Co. of New York*, 955 N.Y.S.2d 66, 70 (N.Y. App. Div. 2012) (citation omitted). I may also consider extrinsic evidence if the language of the contract is ambiguous. *JA Apparel Corp. v. Abboud*, 568 F.3d 390, 397 (2d Cir. 2009). Extrinsic evidence may include consideration of industry custom and practice as well as the parties past dealings with each other. *U.S. Fire Ins. Co. v. Gen. Reinsurance Corp.*, 949 F.2d 569, 572 (2d Cir. 1991).

Crown's second breach of contract claim asserts that the SSA "required Club Car to purchase Batteries to fit its Precedent vehicle line from Crown Battery throughout the term of the Supply Agreement." (Doc. 5, at 8). In Crown's view, the SSA was a "requirements" contract. It contends that Club Car breached the contract when it stopped buying batteries from Crown for its Precedent golf carts.

Club Car asserts that the SSA is not a requirements contract. Rather, the SSA supplied the standard terms for each successive Club Car purchase order, which, in turn, created a new contract between the parties.

A requirements contract obligates a buyer to purchase designated goods exclusively from the seller. 1 White, Summers, & Hillman, UNIFORM COMMERCIAL CODE § 4:20 (6th ed. 2013); *see also Embedded Moments, Inc. v. Int'l Silver Co.*, 648 F.Supp. 187, 192 (E.D.N.Y. 1986) (a requirements contract is "one in which the buyer agrees to purchase his requirements exclusively from the other party to the contract.").

One of the primary benefits of a requirements contract is its flexible nature. If a buyer's needs for a certain good fluctuates, the buyer may be better off with a requirements contract with an indefinite quantity term. Moreover, this does not violate the Statute of Frauds, which requires a definite quantity term in contracts for the sale of goods of at least $500, as the U.C.C. states:

> A term which measures the quantity by the output of the seller or the requirements of the buyer means such actual output or requirements as may occur in good faith, except that no quantity unreasonably disproportionate to any stated estimate or in the absence of a stated estimate to any normal or otherwise comparable prior output or requirements may be tendered or demanded.

N.Y. U.C.C. § 2-306(1) (McKinney).

Club Car's main argument relies on the text of ¶ 2(B) of the SSA: "*No quantity obligations shall be imposed upon CCI* unless specifically detailed in the

5

attached Exhibit A." (Doc. 29-2, at 3) (emphasis supplied). Club Car contends that the SSA did not require it to purchase any amount of batteries from Crown.

In other words, according to Club Car, it could purchase batteries from other suppliers, rather than having to meet its needs exclusively with Crown batteries.

Crown insists the SSA is a requirements contract because it obligated Crown to manufacture 12,000 batteries each week for Club Car and Club Car agreed to purchase some amount of those batteries as it needed. Crown argues that a requirements contract is sufficiently exclusive as long as a buyer is obligated to purchase some quantity of product from the seller, as, it claims, is the case here.

Crown's contention that Club Car agreed to purchase *some* batteries lacks textual support in the SSA. As Club Car argues, ¶ 2(B) of the SSA clearly and unambiguously states that there are no quantity obligations on Club Car to purchase any batteries. Thus, the SSA is not a requirements contract.

Crown repeatedly points to the SSA's text requiring Crown to produce 12,000 batteries each week. This, it notes, put a great strain on Crown's resources and required it to dedicate a significant portion of its manufacturing capacity to meet what it perceived would be Club Car's needs. Crown also notes that the SSA gave Club Car a right of first refusal for those 12,000 batteries and required Club Car to forecast its need for batteries to aid Crown's production planning. All this, Crown argues, expresses Club Car's intention, and thus its contractual commitment, to purchase at least some batteries each week.

It does not. Crown's attempt to cast ambiguity on the contract by suggesting that the production of 12,000 batteries per week makes this a requirements contract fails. The pertinent and

controlling contract language explicitly states that Club Car does not have to purchase any of those batteries. At best, the production of 12,000 batteries makes the SSA look like a buyer's option contract. *See, e.g.*, *In re Modern Dairy of Champaign, Inc.*, 171 F.3d 1106, (7th Cir. 1999) (holding that because the buyer had no obligation to purchase goods, the agreement was consistent with a buyer's option, not a requirements contract).

Moreover, Club Car's right of first refusal and its forecasting requirement do not convert the SSA into a requirements contract.

Because Club Car's right of first refusal is not conditioned on any obligation to purchase Crown batteries, it does not establish exclusivity. In *Structural Polymer Group, Ltd. v. Zoltek Corp.*, 543 F.3d 987, 993 (8th Cir. 2008), the Eighth Circuit stated that if a requirements contract with a right of first refusal "had an *unfettered* option to purchase from another supplier during the term of the contract, than this option would destroy the exclusivity of the arrangement, . . ." Similarly, in *BRC Rubber & Plastics, Inc. v. Continental Carbon Co.*, 876 F. Supp. 2d 1042, 1054 (N.D. Ind. 2012), the court held that the requirements contract's right of first refusal did not negate exclusivity because the buyer was only released from its contractual obligations if the supplier chose not to match the terms of another supplier's written offer. The court reiterated the language of the Eighth Circuit, noting that the right of first refusal here was not "unfettered." *Id*.

Here, Club Car's right of first refusal is unconditional and unfettered. The SSA simply states, "CCI shall have the first right of refusal for the first such twelve thousand (12,000) units each week." Unlike the contract in *BRC Rubber*, the contract here does not allow Crown to match the terms of another battery supplier if Club Car exercises its right of first refusal. Club Car may simply exercise the right and Crown is left with however many batteries Club Car did not order.

7

Moreover, the SSA does not presume Club Car will purchase 12,000 batteries each week unless it submits an order for a different quantity. Rather, ¶ 2(B) of the SSA states Club Car will communicate its desired quantity of batteries through a supplier interface system for each purchase order. There is no language in the contract that suggests Club Car is on the hook for all, or even some, of those 12,000 batteries.

Additionally, ¶ 2(C) of the SSA, which states that Club Car will provide Crown with a forecast of its expected product needs, does not make the SSA a requirements contract. The language specifically states that "'[t]he forecast is to aid CROWN in planning purposes only." (Doc. 29-2, at 3). It goes on to caution that "CCI shall not be liable in any manner for Product requests that are a deviation from these forecasts so long as CCI's forecast is provided in good faith to Crown." *Id*. Thus, the forecasting was in no way binding on the parties. *See also Brooklyn Bagel Boys, Inc. v. Earthgrains Refrigerated Dough Products, Inc.*, 212 F.3d 373, 3790-380 (7th Cir. 2000) (finding there was no requirements contract because the use of forecasts "were not binding on either party").

Because this is not a requirements contract, I need not determine whether Club Car operated in good faith under U.C.C. § 2-306 when it stopped purchasing batteries from Crown.

Though the SSA is not a requirements contract, it is still enforceable. As Club Car argues, the SSA is a master supply agreement. It establishes the terms for future purchase orders of batteries. Paragraph 5(A) of the SSA states that, "Product purchases will be made with Orders issued by individual CCI procurement departments. . . . This Agreement in and of itself does not constitute an Order." (Doc. 29-2, at 4). Thus, each purchase order forms a separate and distinct sales contract.

Citing *Johnson Controls, Inc. v. Anson Stamping Co.*, 2000 WL 34249108 (W.D. Ky.), Club Car argues that this type of commercial arrangement is commonplace. In *Johnson Controls*, the

8

parties entered into a supply agreement for automotive parts. *Id.* at *1. The agreement did not include a minimum quantity term or an exclusivity provision. When the buyer purchased parts from a different supplier, the seller asserted that the agreement was a requirements contract which the buyer had breached. The court noted that the supply agreement did not obligate the buyer to purchase anything from the seller but merely "set forth the terms and conditions under which Purchase Orders from [the buyer] would be issued to [the seller]." *Id.* at *3.

The situation here is indistinguishable. Crown's only argument is that, unlike the contract in *Johnson Controls*, the SSA here required Club Car to purchase at least some of the 12,000 batteries. As discussed above, however, the SSA does not impose such requirement.

Finally, Club Car argues that Crown's alternatively plead claims for account stated, promissory estoppel, unjust enrichment, and conversion (Counts Five through Eight, respectively) fail to the extent that Crown seek damages as a result of lost business. Crown argues that its claims, specifically promissory estoppel, must remain intact because promissory estoppel is an exception to the Statute of Frauds.

Because Crown bases its promissory estoppel claim on damages for lost profits, I grant summary judgment in favor of Club Car on that count. The SSA unambiguously states that Club Car had no obligation to purchase batteries from Crown. Whatever reliance Crown placed on Club Car's statements about future battery purchases is not actionable. *See, e.g.*, *NCC Sunday Inserts, Inc. v. World Color Press, Inc.*, 759 F. Supp. 1004, 1011 (S.D.N.Y. 1991) ("When an enforceable contract does exist, the parties cannot assert a claim for promissory estoppel based on alleged promises that contradict the written contract."); *Johnson Controls*, *supra*, 2000 WL 34249108, *3 (dismissing all

9

claims which assert damages based on lost profits after finding that a requirements contract did not exist).[1]

## Conclusion

It is, accordingly,

ORDERED THAT Club Car's motion for partial summary judgment (Doc. 29) be, and the same hereby is granted.

So ordered.

/s/ James G. Carr
Sr. U.S. District Judge

---

[1] This decision does not affect claims which Crown does not base on lost profits.