**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

Crown Battery Manufacturing Co.,                              Case No. 3:12CV2158

                Plaintiff

        v.                                                                            **ORDER**

Club Car, Inc.,

                Defendant

      This is a contract and warranty suit between a battery maker, plaintiff Crown Battery Manufacturing, Inc., and a manufacturer of golf carts, defendant Club Car, Inc.

      The core dispute is straightforward: who is responsible for the fact that the Crown-made batteries powering Club Car's carts could not hold a charge, such that the carts regularly lost power during a round of golf? *See Crown Battery Mfg. Co. v. Club Car, Inc.*, 2015 WL 5011988, *4-5 (N.D. Ohio) (*Crown VIII*).

      Crown contends its batteries met Club Car's specifications. It blames the carts' onboard charger (OBC), which, in Crown's telling, did not accurately measure the amount of draw on the battery and thus could not fully recharge it. Club Car alleges that Crown's batteries did not conform to the specifications it gave Crown.

      More than three years into litigation, a Club Car representative disclosed at his Rule 30(b)(6) deposition that the company had not preserved, or taken any steps calculated to preserve, any of the thousands of batteries that form the basis of its warranty claims. Instead, it had left in place its

battery-destruction practices, under which Club Car dealers and customers with a defective Crown battery retained the battery for only ninety days. If Club Car did not request the battery during that time, the customer was free to scrap it.

This disclosure prompted Crown's pending motion for sanctions. (Doc. 127).

It contends Club Car's conduct amounts to intentional or, at the very least, negligent spoliation of relevant evidence. Crown asks me to sanction Club Car by dismissing its warranty claims, granting it summary judgment on those claims, or issuing an adverse-inference instruction.

For the following reasons, I grant the motion and the request for a mandatory adverse-inference instruction.

## Background

### A. Contract

The parties executed a Strategic Supply Agreement in September, 2009. *Crown Battery Mfg. Co. v. Club Car, Inc.*, 2013 WL 5670950, *1 (N.D. Ohio) (*Crown I*). Crown agreed to produce a certain number of batteries each week, and Club Car would buy a portion of those batteries on an as-needed basis.

Crown warranted that its batteries "will be free from all defects in title, design, material and workmanship," and that they "will be in strict accordance with the mechanical and performance specifications and all other requirements set forth in the drawings for those [batteries] and in any specification referenced in those drawings[.]" (Doc. 127-5 at 5).

The contract assigned Crown the responsibility to ensure that the batteries were compatible with Club Car's carts and "all interrelated systems." (*Id.*). Crown accordingly "represent[ed] and

2

warrant[ed] that it is familiar with all interrelated systems and Batteries within the Vehicles that could affect the performance, reliability and functionality of the Products[.]" (*Id.*).

Crown agreed that it would bear "liability for all Vehicle failures to the extent that they result directly from a defect or deficiency in a [battery's] design, including (without limitation) a [battery's] integration into a Vehicle." (*Id.*). It would not be liable, however, for any battery that failed "as a direct result of," *inter alia*, "being abused or misused, destroyed, or charged by defective charger or charging errors including overcharging, undercharging, or incomplete charging for any reason[.]" (Doc. 127-5 at 11).

The contract also spelled out how the parties would process warranty claims.

After a customer complained about a defective Crown battery, Club Car could request the battery and test it for defects. A "Battery Test Sheet," a document that Club Car created and Crown approved, was "the sole criteria for judging if a battery has failed." (*Id.* at 12). Once Club Car determined that a battery had failed, Crown had "the burden of proof that a failed battery is due to one or more of the conditions set forth in [the warranty-limitation section described] above." (*Id.*).

When Crown received a warranty claim from Club Car, it had thirty days from the date it received the claim to challenge it. (*Id.*). Within that same thirty-day period, Crown could request that Club Car produce the battery.

The parties used a proprietary database called Tavant to submit, respond to, and monitor the status of warranty claims.

## B. Business

Beginning in January, 2010, Crown produced more than 12,000 batteries each week for Club Car's use. *Crown Battery Mfg. Co. v. Club Car, Inc.*, 2014 WL 587142, *1 (N.D. Ohio) (*Crown II*).

Crown "delivered the batteries to its warehouse, from which Club Car would take batteries as needed." *Id.*

In early 2011, however, "Club Car told Crown that Crown batteries in its golf carts were failing because they were not holding charges. In May, 2011, Club Car tendered hundreds of warranty claims for defective batteries. Crown refused to honor the claims, stating that the OBCs, not its batteries, were defective." *Crown Battery Mfg. Co. v. Club Car, Inc.*, 2014 WL 587147, *1 (*Crown III*).

By October, 2011, Club Car was purchasing only 5,000 to 7,000 batteries each week. The next month, with reports of failed batteries piling up, Club Car told Crown it would no longer use its batteries in the Precedent line of golf carts. *Id.* Club Car ceased purchasing Crown batteries by March, 2012, though in April it took $2.3 million worth of batteries from Crown's warehouse without paying for them. (Doc. 81-1 at ¶¶147-48); *Crown Battery Mfg. Co. v. Club Car, Inc.*, 2014 WL 1379594, *1 & n.1 (N.D. Ohio) (*Crown IV*).

"In and around 2012," Club Car put all of its pending warranty claims against Crown – totaling some $12 million – on "hold status" in the Tavant database. (Doc. 127 at 5).

A Club Car representative, Steven Nissen, testified that this move was merely a way "to bin the claims such that [Crown] can see them, yet they are not subject to a timing constraint for a response." (Doc. 127-2 at 2). At the same time, Nissen acknowledged that the hold status prevented Crown from "accept[ing] or reject[ing] the claim[s]." (Doc. 127-2 at 2).

## C. Litigation

Crown filed this suit in August, 2012. (Doc. 1). Extensive pretrial motion practice has pared the case down essentially to Crown's claims related to the $2.3 million Club Car owes it for batteries, and Club Car's counterclaims for breach of warranty and breach of contract.

Despite engaging in substantial discovery, Crown never asked Club Car to produce the defective batteries or a sample thereof. In its third set of interrogatories, however, which it served in March, 2014, Crown asked Club Car to "describe Club Car's process for holding/retaining batteries for each [of its warranty] claim[s]" against Crown. (Doc. 127-1 at 5). Club Car refused to answer on grounds that the question "seeks information not relevant to the claims and defenses at issue in this action[.]" (*Id.*).

Crown, which now argues that "the batteries are the most relevant and important evidence related to Club Car's counterclaims and Crown's defenses to those counterclaims" (Doc. 127 at 5), did not press the issue further, whether via a request for an informal discovery conference, a motion to compel, or otherwise.

There the issue apparently stood until Nissen's deposition on October 22, 2015.

Counsel for Crown questioned Nissen about Club Car's battery-preservation procedures, and Nissen disclosed that Club Car's dealers and customers had destroyed all or nearly all the batteries that form the basis of Club Car's warranty claims:

> Q:  Where does Club Car keep the batteries while the inspection period set forth in section five [of Exhibit A to the Strategic Supply Agreement] is pending?
>
> A:  The batteries are kept at the dealer location that was serviced, unless we ourselves request to keep it.

Q:      So it's up to the dealer to house the batteries while a warranty claim is pending?

A:      That's true, yes.

Q:      How does Club Car monitor that the dealers are keeping a warranty – I'm sorry, keeping the batteries while the warranty claim is pending? What does Club Car do to make sure that's happening?

A:      We tell them they are to do it.

Q:      You testified earlier that there are numerous warranty claims on hold in Club Car's Tavant system, right?

A:      Yes.

Q:      Where are all the batteries that pertain to those warranty claims?

A:      If they were replaced within the last 90 days, they would still be with the dealer.

Q:      And if they weren't replaced within the last 90 days, where would they be?

A:      They went to the recycling center.

Q:      What has Club Car done to confirm what batteries do or don't exist for purposes of the warranty claims that have been on hold for two to three years?

A:      The dealers are instructed to hold batteries for 90 days, and if Club Car has not requested them back within those 90 days, they are to recycle them. We don't –

Q:      As – sorry.

A:      That's it.

Q:      Has Club Car instructed any dealers to hold batteries that are the subject of warranty claims that are on hold for Crown?

A:      No.

Q:      Why not?

6

A:      Because it would cause undue burden on them and the three-year-old battery
        is probably not use [*sic*] to anyone.

Q:      So if the batteries don't exist, they can't be tested for purposes of what the
        warranty actually pertains to, right?

A:      That's correct. If they don't exist, you cannot test them.

(Doc. 127-2 at 4-5).

Nissen also testified that Club Car profited from its dealers' scrapping of the Crown batteries.

When a dealer recycled a battery, it received an amount of money for the lead inside the battery. Club Car deducted that sum from the amount it paid on the dealer's warranty claim, thereby resulting in lower warranty costs for Club Car.

Crown represents that Nissen's deposition was the first time it learned of Club Car's battery-destruction practices.

In light of that disclosure, Crown served Club Car, on November 20, 2015, with additional interrogatories, requests for production, and requests for admission. It sought, *inter alia*, an admission that Club Car had not retained any battery that was the subject of a warranty claim and information on the whereabouts of any extant batteries relevant to the suit.

Crown also asked Club Car's counsel to "notify [Club Car's] dealers in writing to hold all Crown batteries that are the subject of warranty claims ***until the conclusion of this litigation*** – the instruction that should have been given at the outset of the parties' dispute." (Doc. 127-4 at 1) (emphasis in original).

Crown states, without contradiction, that Club Car's counsel did not respond to that request.

7

But Crown's further assertion that Club Car "failed to respond to the Requests for Admission" is a misrepresentation of the record: Club Car served its responses on December 14, 2015. (Doc. 129-2 at 1-19).

## Discussion

Spoliation is "the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *Owner-Operated Ind. Drivers Ass'n v. Comerica Bank*, 860 F. Supp. 2d 519, 537 (S.D. Ohio 2012), *aff'd in part and vacated in part on unrelated grounds*, 562 F. App'x 312 (6th Cir. 2014).

A party seeking sanctions for an opponent's spoliation of evidence must show: "(1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the [evidence] was destroyed with a culpable state of mind; and (3) that the destroyed evidence was relevant to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense." *Beaven v. U.S. Dep't of Justice*, 622 F.3d 540, 553 (6th Cir. 2010).

The law gives me "broad discretion to craft proper sanctions for the spoliation of evidence." *Adkins v. Wolaver*, 692 F.3d 499, 503 (6th Cir. 2012).

A proper sanction both levels the playing field and punishes the wrongdoer by placing "the risk of an erroneous judgment on the party that wrongfully created the risk." *Roth v. Sloan*, 2011 WL 1298498, *3 (N.D. Ohio) (Oliver, C.J.); *accord Owner-Operated*, *supra*, 860 F. Supp. 2d at 538.

## A. Timeliness

Civil Rule 37 "governs most motions for discovery sanctions, but it does not contain any specific reference to the timing of a motion seeking spoliation sanctions." *Goodman v. Praxair Servs., Inc.*, 632 F. Supp. 2d 494, 506 (D. Md. 2009).

Courts considering have therefore identified five factors relevant to a "discretionary timeliness assessment" of a spoliation motion:

> First . . . is how long after the close of discovery the relevant spoliation motion has been made. Second, a court should examine the temporal proximity between a spoliation motion and motions for summary judgment. Third, courts should be wary of any spoliation motion made on the eve of trial. Fourth, courts should consider whether there was any governing deadline for spoliation motions in the scheduling order issued pursuant to Fed. R. Civ. P. 16(b) or by local rule. Finally, the explanation of the moving party as to why the motion was not filed earlier should be considered.

*Keck v. Gander Mtn. Co.*, 2015 WL 6756151, *4 (N.D. Ohio) (Pearson, J.).

Club Car contends Crown's motion is untimely under these principles.

It emphasizes that Crown: 1) did not file the motion until February 10, 2016, twenty-six days after discovery closed; 2) filed the motion only fourteen days before its summary-judgment motion was due and four months before trial; and 3) offers "no sound explanation for why this Motion was not brought earlier." (Doc. 129 at 23).

Crown argues that its motion is timely.

It points out that it sought sanctions less than four months after it first learned of Club Car's battery-destruction practices. During that period, Crown argues, it was hardly idle. Rather, it undertook additional discovery – two more Rule 30(b)(6) depositions and the serving of further

9

discovery requests – to confirm whether Club Car failed preserve the batteries. Crown also tried to work with opposing counsel to place a litigation hold on any extant batteries.

I agree with Crown that its motion is timely.

Admittedly, Crown likely could have filed the motion shortly after Nissen's October, 2015 deposition.

But such a motion would have been relatively "bare bones" and lacking in factual support. To resolve it, I likely would have needed to wait until Crown conducted discovery to learn more about Club Car's battery-destruction practices, the extent of the destruction, and the whereabouts of any extant batteries. The fact that Crown undertook this discovery on the front end, rather than the back end, does not make the motion untimely.

Crown's filing does not, moreover, come on the eve of trial, nor does it violate any scheduling order or local rule. That the motion came less than a month after the close of discovery is also of little concern. *E.g.*, *Keck*, *supra*, 2015 WL 6756151, at *5 (spoliation motion filed two-and-a-half months after discovery closed not untimely).

Furthermore, and contrary to Club Car's suggestion, the fact that Crown's motion preceded the summary-judgment deadline tends to show the motion is timely. The case law teaches that spoliation motions that come as part of an opposition to summary judgment, or in a reply in support of a summary-judgment motion, are the ones that face timeliness problems. *Goodman*, *supra*, 632 F. Supp. 2d at 507 (collecting cases).

Finally, Crown has a reasonable explanation for why its motion did not come sooner: it did not learn, until October 22, 2015, that Club Car took no steps to preserve any of the batteries that are the subject of its warranty claims.

10

According to Club Car, Crown is "feign[ing] ignorance of Club Car's business practice of asking its dealers to hold batteries for period of 90 days" and allowing them to destroy the batteries thereafter. (Doc. 129 at 23). But Club Car has produced no evidence – no language in the Strategic Supply Agreement, no emails, no correspondence, nothing – to support that accusation. I therefore credit Crown's representation and make the factual finding that Crown did not know of Club Car's battery-destruction practices until Nissen disclosed them during his deposition.

Finally, Club Car argues I should deem the motion untimely because Crown never "request[ed] a battery for inspection during the pendency of this litigation[.]" (Doc. 129 at 23).

To the extent this omission matters at all, I do not believe that it is relevant to the timeliness inquiry. Courts conduct timeliness inquiries when deciding spoliation motions because these motions must be:

> filed as soon as reasonably possible *after discovery of the facts that underlie the motion*. This is because resolution of spoliation motions are fact intensive, requiring the court to assess when the duty to preserve commenced, whether the party accused of spoliation properly complied with its preservation duty, the degree of culpability involved, the relevance of the lost evidence to the case, and the concomitant prejudice to the party that was deprived of access to the evidence because it was not preserved.

*Goodman*, *supra*, 632 F. Supp. 2d at 508 (emphasis added).

Spoliation issues, which frequently arise late in the game, have great potential to disrupt the pretrial schedule and delay the start of trial. But these concerns are only theoretical here, as Crown's motion followed quickly enough on the heels of Nissen's deposition that I was able to resolve it with minimal disruption to the pretrial schedule.[1]

---

[1] That is not to say the motion came without a significant opportunity cost. Instead of deciding the parties' counter motions for summary judgment, I have spent an inordinate amount of time resolving a sanctions motions that Crown should never have had to file.

Nothing in the record shows that Crown unreasonably delayed in filing the spoliation motion. Because the motion is timely, I turn to the merits.

## B. Control

Only parties "having control over the evidence" at issue have a duty to preserve. *Beaven*, *supra*, 622 F.3d at 553. The first question, therefore, is whether Club Car had controlled the batteries.

It is undisputed that the destroyed batteries were largely or entirely in the hands of non-parties: dealers of Club Car carts and golf clubs that had purchased Crown-powered carts.

Crown argues that, the lack of physical possession notwithstanding, Club Car exercised control over the batteries. It points to Nissen's testimony that Club Car: 1) instructed dealers who had submitted warranty claims to hold the batteries for ninety days; and 2) told the dealers they were free to destroy the batteries if Club Car had not requested them within that time frame. Crown also points to evidence that Club Car had the power to request a battery to conduct its own testing, and that it exercised this power at least occasionally.

Club Car responds that it had "no duty to ensure the preservation of the batteries by third parties[.]" (Doc. 129 at 25).

This argument is doubly flawed: it not only frames the issue at too high a level of generality, but also elides the critical question whether Club Car had control over the batteries.

For purposes of spoliation motions, courts deem evidence to be "under a party's control when that party has the right, authority, or practical ability to obtain the [evidence] from a non-party to the action." *Goodman*, *supra*, 632 F. Supp. 2d at 515; *cf. Arch Ins. Co. v. Broan-NuTone, LLC*, 509 F. App'x 453, 458-59 (6th Cir. 2012) (litigant controlled evidence where it hired third-party to store

evidence); *Coach, Inc. v. Dequindre Plaza, L.L.C.*, 2013 WL 2152038, *7-8 (E.D. Mich.) (litigant that had power to authorize non-party to destroy evidence controlled evidence).

Spoliation cases are "fact specific and depend on the unique circumstances of the destruction as well as the nature of the relationship between the party and third-party responsible for the spoliation." *Coach*, *supra*, 2013 WL 2152038, at *7.

Unsurprisingly, then, there are cases in which a third party's spoliation of evidence warranted sanctions against a litigant, *e.g.*, *Arch Ins. Co*, *supra*, 509 F. App'x at 458-59, and cases in which it did not, *e.g.*, *Adkins*, *supra*, 692 F.3d at 504-05.

Far from being dispositive, Club Car's lack of physical possession merely raises the question whether it had control over the batteries. And the evidence from Club Car's own representatives – evidence that Club Car neither acknowledges nor attempts to rebut – establishes that it had, at the very least, the "practical ability," *Goodman*, *supra*, 632 F. Supp. 2d at 515, to obtain the batteries from its dealers and customers.

Steven Nissen's testimony was unambiguous: Club Car instructed dealers to retain the batteries for only ninety days, and to scrap them if Club Car had not requested a battery in that time. Importantly, Nissen considered these instructions sufficient to ensure that the batteries would be available should Club Car or Crown want to test them:

> Q:    How does Club Car monitor that the dealers are keeping a warranty – I'm sorry, keeping the batteries while the warranty claim is pending? What does Club Car do to make sure that's happening?
>
> A:    We tell them they are to do it.

(Doc. 127-2 at 4).

13

It is also undisputed that Club Car obtained physical possession of at least some batteries that form the basis of its warranty claims. Paul McCleod, a Club Car engineer, testified that he participated in or observed "teardown reviews" of "Crown batteries" that had been "returned" to Club Car "on a warranty claim[.]" (Doc. 127-6 at 2). This evidence reinforces Nissen's testimony that Club Car could obtain the batteries simply by asking for them.

In sum, the record shows that Club Car had the power to ensure that its dealers preserved batteries during the inspection period, that it could request the allegedly defective batteries if it wished, and that it in fact exercised that power to inspect some batteries.

I therefore conclude that Club Car had control over the batteries forming the basis of its warranty claims. It therefore follows that Club Car could have directed its dealers to preserve, if not all such batteries, at least a representative sample thereof.[2]

### C. Duty to Preserve

The next question is whether Club Car had a duty to preserve the batteries for Crown's use.

"The common law imposes the obligation to preserve evidence from the moment that litigation is reasonably anticipated." *Victor Stanley, Inc. v. Creative Pipe, Inc.*, 269 F.R.D. 497, 521 (D. Md. 2010); *see also Owner-Operated*, *supra*, 860 F. Supp. 2d at 538 (same). All parties therefore "have a duty to preserve material evidence during litigation as well as during the time before

---

[2] I also agree with those courts that have found that "[i]f a party cannot fulfill this duty to preserve because he does not own or control the evidence, he still has an obligation to give the opposing party notice of access to the evidence or of the possible destruction of the evidence if the party anticipates litigation involving that evidence." *Silvestri v. Gen. Motors Corp.*, 271 F.3d 583, 591 (4th Cir. 2001); *accord Lexington Ins. Co. v. Tubbs*, 2009 WL 1586862, *3 (W.D. Tenn.). Even assuming it did not have control over the batteries, Club Car should have notified Crown that the batteries at issue were subject to only a ninety-day holding period, and that its dealers were regularly scrapping batteries Crown had not requested. Yet Club Car failed to comply with even this minimally burdensome duty.

14

litigation when a party reasonably should know that the evidence may be relevant to anticipated litigation." *Lexington*, *supra*, 2009 WL 1586862, at *3.

Crown filed suit on August 22, 2012, thereby triggering Club Car's preservation duties.

In fact, the duty arose much earlier.

The parties' business relationship soured in early 2011. By May of that year, Club Car had sought redress for hundreds of allegedly defective Crown batteries, but Crown had denied liability and blamed the carts' OBCs. In November, Club Car notified Crown that it would soon cease purchasing Crown batteries for its Precedent line of carts.

If that were not enough to make some sort of contract-related litigation foreseeable, the final straw dropped in April, 2012, when Club Car took some $2.3 million worth of Crown batteries without paying for them. Indeed, it is that occurrence that forms the basis of Crown's claims.

Club Car's opposition does not respond to any of these considerations, nor does it acknowledge the company's common-law preservation duty. (Doc. 129 at 23-25). Instead, it argues that the Strategic Supply Agreement essentially absolved it of, or superseded, any duty to preserve the batteries.

According to Club Car, Crown "had unfettered access to view all warranty claims submitted by Club Car, including those placed 'on hold' for purpose of Crown accepting or rejecting the claim, through the Tavant system." (*Id.* at 23-24). Club Car also emphasizes that the Strategic Supply Agreement gave Crown the right to request batteries when responding to a warranty claim. Because Crown never invoked that right, Club Car's argument goes, Crown, not Club Car, is responsible for the batteries' destruction.

This conception of the duty to preserve is fundamentally flawed.

15

"Once the duty to preserve attaches, a party must suspend its routine document retention/destruction policy and put in place a litigation hold to ensure the preservation of relevant documents." *Owner-Operated*, *supra*, 860 F. Supp. 2d at 538.

Club Car's attempt to turn this obligation on its head – and to place on Crown the responsibility to ensure the batteries were available for litigation – is baseless. Club Car cites no authority for the proposition that an opponent's failure to request evidence that it has a contractual right to obtain absolves the party with control over that evidence from preserving it for litigation. This argument, which is unpersuasive enough in the abstract, rings even more hollow here, where it is undisputed Crown did not know Club Car had authorized its dealers to destroy the batteries on which its warranty claims rested.

I therefore conclude Club Car had a duty to preserve that arose, at the very latest, in April, 2012. I further conclude Club Car violated that duty by taking no steps to ensure its dealers preserved at least a representative sample of the batteries forming the basis of its warranty claims.

### D. Culpability

I now consider the degree of culpability that attaches to Club Car's spoliation.

"To warrant a spoliation sanction, the party seeking the sanction must show that the evidence was destroyed with a culpable state of mind." *Adkins*, *supra*, 692 F.3d at 504.

"The culpable state of mind factor is satisfied by a showing that the evidence was destroyed knowingly, even if without intent to breach a duty to preserve it, or negligently." *Beaven*, *supra*, 622 F.3d at 554 (internal quotation marks, brackets, and emphasis omitted).

An accurate assessment of the defendant's state of mind "is important because the Court can impose different spoliation sanctions, calibrating severity of the remedy on the party's degree of fault

16

under the circumstances." *In re Black Diamond Mining Co.*, 514 B.R. 230, 239 (Bankr. E.D. Ky. 2014).

But I do not need to find that Club Car acted in "bad faith" before I can impose sanctions. "To the extent bad faith is relevant in a spoliation motion, its [*sic*] most appropriately taken into consideration when adjusting the sanction imposed." *Johnson v. Metro. Gov't of Nashville and Davidson County, Tenn.*, 502 F. App'x 523, 533 (6th Cir. 2012).

Crown argues that Club Car's conduct amounts to "willful destruction" of evidence. (Doc. 127 at 15).

Citing Club Car's battery-destruction practices, Crown asserts that Club Car "destroy[ed] batteries, [did] not suspend[ ] its battery destruction policy and instruct[ed] dealers to destroy the batteries." (Doc. 147 at 7). At the very least, Crown contends, the failure to implement a litigation hold shows that Club Car was negligent.

Club Car denies that it "order[ed] the destruction of evidence." (Doc. 129 at 25). Rather, Club Car contends that its dealers were merely following "usual business practices" when they destroyed batteries after the ninety-day holding period. (*Id.* at 27).

Besides the unconvincing argument that it had no duty to preserve the batteries, Club Car does not acknowledge its failure to impose a litigation hold on its dealers' battery-destruction practices.

There is no doubt that Club Car's failure to impose a litigation hold with respect to the batteries was at least negligent. *Owner-Operated*, *supra*, 860 F. Supp. 2d at 539 (plaintiffs' counsels' admission "that a litigation hold was never placed on [evidence] related to the litigation" established that "Plaintiffs and their counsel were at least negligent").

17

But Club Car's failure to preserve the batteries was more culpable than that. It was a knowing spoliation of evidence.

Club Car took steps to ensure that a defective battery would be available for its and Crown's use during a ninety-day testing period. Yet it never told Crown that Club Car's dealers and customers would destroy, immediately thereafter, any batteries that it or Crown had not requested. Moreover, Club Car resisted Crown's efforts to learn, via the March, 2014, interrogatories, how Club Car had preserved the thousands of batteries on which its warranty claims rested.

As its dealers continued to destroy batteries, Club Car remained silent for another eighteen months, until Steven Nissen finally disclosed that Club Car had done nothing to preserve the batteries at issue.

Despite being on notice of Crown's interest in the batteries, despite never disclosing the fact that its dealers were destroying all batteries Crown had not requested to test, and despite having the duty to preserve relevant evidence for Crown's use, Club Car allowed the destruction to continue unabated for years.[3]

These facts show that Club Car's breach of its preservation duties was not accidental or the result or carelessness or oversight. It amounts to a knowing spoliation – that is, spoliation done voluntarily and with full awareness of its consequences.

There is, however, no evidence that Club Car acted in "bad faith" or violated its preservation duties with the intent to deny Crown access to the batteries.

_____

[3] Indeed, Nissen testified at his October, 2015 deposition that warranty claims on Crown batteries "are still coming in today." (Doc. 127-2 at 2). Club Car's failure to impose a litigation hold, even after Crown's attorneys made a reasonable request along those lines in November, 2015, apparently contributed to further spoliation of evidence.

In an effort to show otherwise, Crown stresses the undisputed fact that Club Car "instruct[ed]" its dealers to destroy batteries. (Doc. 147 at 7). Yet this instruction was merely a part of Club Car's battery-destruction practices, which Club Car devised before litigation began. There is no evidence that Club Car so instructed its dealers only after learning of Crown's interest in the batteries, or because Club Car feared what Crown might learn while testing the batteries.

For all these reasons, I find that Club Car knowingly spoliated the batteries that form the basis of its warranty claims.

### E. Relevance

The final consideration is whether the batteries are relevant to Crown's claims or defenses.

"[T]he party seeking the adverse inference must adduce sufficient evidence from which a reasonable trier of fact could infer that the destroyed or unavailable evidence would have been of the nature alleged by the party affected by its destruction." *Automated Solutions Corp. v. Paragon Data Sys., Inc.*, 756 F.3d 504, 514 (6th Cir. 2014).

Crown argues that the batteries are relevant to establishing its defenses to the breach-of-warranty claims.

It points out that, after Club Car determined, via a Battery Test Sheet, that a battery had failed, Crown had "the burden of proof that a failed battery is due to one or more of the conditions" limiting Crown's warranty obligations. (Doc. 127-5 at 12). Without the batteries, Crown argues, it has no way to show that the batteries failed for a reason that it had not warranted against.

Crown also alleges that the batteries are "essential to Club Car's breach of contract claim." (Doc. 147 at 7).

The contract makes Crown liable for all "Vehicle failures to the extent that they result directly from a defect or deficiency in a [battery's] design." (Doc. 127-5 at 5). Crown argues that Club Car's only evidence on the "directly results" question are the Battery Test Sheets, but that these documents "pertain only to the functionality of the batteries and not to other components of the vehicle, such as the OBC." (Doc. 147 at 7). "Without the batteries," Crown contends, Club Car cannot "link 'Vehicle failures' with any alleged defect or deficiency in the design of the batteries." (*Id.*).

Club Car contends the batteries are irrelevant.

It argues that Crown does not need to test individual batteries because the Battery Test Sheets are the "sole criteria for judging if a battery has failed," and Crown can access those documents, via the Tavant database, for "each and every warranty claim[.]" (Doc. 129 at 28).

Club Car also challenges the *bona fides* of Crown's position.

It notes that Crown has long contended that Club Car did not give it accurate specifications that would ensure Crown's batteries worked with Club Car's carts.

But Club Car asserts that, during discovery, Crown proved "unable to point to any 'inaccurate specifications'" (*id.*), and that Club Car's victory at summary judgment is now a foregone conclusion. "[O]n the eve of summary judgment briefing," Club Car continues, "Crown is suddenly arguing that it needs to inspect 'thousands' of individual batteries to determine whether, and the reason for why, such batteries failed." (*Id.*).

Club Car's arguments lack merit.

First, the batteries are relevant to Crown's defense of the breach-of-warranty claims. As already mentioned, the Strategic Supply Agreement assigns Crown the burden of proving that a

battery failed for a reason the warranty does not cover. This burden arises, moreover, only after Club Car determines, via the Battery Test Sheet, that a battery has failed.

Accordingly, the Battery Test Sheets are not sufficient for Crown to establish it defense. They provide only the "what" – failed or functional battery – and not the "why" – the reason for the failure.

Crown's theory as to the "why" is that the onboard charger was inherently flawed, as it did not accurately measure the amount of draw on the battery and was therefore incapable of recharging it. The warranty provisions of the Strategic Supply Agreement state that Crown is not liable for any battery that failed because of a "charging error[ ] including overcharging, undercharging, or incomplete charging for any reason[.]" (Doc. 127-5 at 11).

Steven Nissen testified not only that a malfunctioning OBC could cause these types of "charging errors," but also that the Battery Test Sheets would not reflect whether such an error had occurred:

> Q:    What do you mean by that?
>
> A:    The OBC is a – is a computer device that controls charge based on parameters and the algorithm. So a charging error in this case would be those that the OBC is not following the – the algorithm.
>
> Q:    And how do you tell on a [battery] test sheet whether the OBC is following the algorithm?
>
> A:    You can't. The test sheet is not an OBC test report or method.

(Doc. 147-3 at 8).

21

For these reasons, the batteries are relevant to Crown's defenses. Indeed, they appear to be indispensable to Crown's ability to meet its burden of proof under the Strategic Supply Agreement's warranty provisions.

Second, Club Car has not persuaded me that Crown's interest in the batteries is a last-ditch effort to salvage a case that it cannot unless I sanction Club Car.

As just discussed, there is an obvious link between the batteries Club Car destroyed and Crown's ability to prove its defenses to the breach-of-warranty claim. The batteries likewise appear relevant to Club Car's own claims, given that Crown is in breach if a golf cart's failure results "directly" from a defectively designed battery, but not if it results directly from a defective OBC. Finally, Club Car has not identified any point in this protracted and bitterly contested litigation where Crown has taken a position that is inconsistent with its claim that the batteries are relevant to its defenses.

I therefore conclude the spoliated batteries are relevant.

### F. Sanction

Finally, I must decide the appropriate sanction to levy against Club Car.

Because there is no evidence that Club Car acted in bad faith, the harshest sanctions that Crown has asked for – dismissal of Club Car's counterclaims or the grant of summary judgment to Crown on those claims – are not appropriate. *Cf. Victor Stanley*, *supra*, 269 F.R.D. at 534 ("Courts may order a default judgment or dismissal to send a strong message to other litigants, who scheme to abuse the discovery process and lie to the Court, that this behavior will not be tolerated and will be severely sanctioned.").

22

The more appropriate sanction is an adverse-inference instruction, either mandatory or permissive.

"An adverse inference is an inference that the party fears producing the evidence; and this fear is some evidence that the circumstances or document or witness, if brought, would have exposed facts unfavorable to the party." *Flagg v. City of Detroit*, 715 F.3d 165, 177 (6th Cir. 2013) (internal quotation marks and brackets omitted).

"[A]n adverse inference is usually only permissive for the factfinder, not mandatory[.]" *Beaven*, *supra*, 622 F.3d at 555. But whether "an adverse inference is permissive or mandatory is determined on a case-by-case basis, corresponding in part to the sanctioned party's degree of fault." *Flagg*, *supra*, 715 F.3d at 178.

The permissive inference is "simply a formalization of what the jurors would be entitled to do even in the absence of a specific instruction." *West v. Tyson Foods, Inc.*, 374 F. App'x 624, 635 (6th Cir. 2010). It tells the jury that it is free to infer, from the fact that a litigant failed to preserve evidence, that the evidence would have proved a fact adverse to the litigant's case. Because the instruction comes "dressed in the authority of the court," it has "more weight than if merely argued by counsel." *Arch Ins. Co.*, *supra*, 509 F. App'x at 459.

Permissive inferences are "particularly appropriate if the evidence was not destroyed intentionally." *Id.*

A mandatory-inference instruction, in contrast, requires that the jury infer a given fact.

It is appropriate when, for example, a litigant's destruction of evidence "severely compromised" its opponent's case "by depriving [the opponent] of the most relevant piece of evidence to prove their claims." *Beaven*, *supra*, 622 F.3d at 555.

23

Club Car's degree of fault weighs in favor of imposing a mandatory, non-rebuttable inference. While the company did not act with the intent to deny Crown access to the batteries, it knowingly spoliated evidence for at least three-and-a-half years. It was on notice, moreover, of Club Car's interest in the batteries no later than March, 2014, and it should have been foreseeable that, in litigation concerning defective batteries, at least one side would want to take a look at the batteries. Nevertheless, its spoliation was total, leaving no batteries left for Crown to use to defend the breach-of-warranty claims.

The relevance of the spoliated batteries, and the corresponding prejudice to Crown, also warrants a harsh sanction. Club Car's spoliation has left Crown without the means to prove that its batteries failed for a reason that Crown did not warrant against.

Given these circumstances, a permissive-inference is inadequate to cure the prejudice that Club Car's spoliation of critical evidence has inflicted on Crown. *Compare Gilley v. Eli Lilly & Co.*, 2013 WL 1701066, *7-9 (fact that defendant had access to printed copies of digital images that plaintiff destroyed militated in favor of permissive inference); *Flagg v. City of Detroit*, 2011 WL 4634245, *8 (E.D. Mich.) (mandatory-inference instruction against defendant too harsh where plaintiffs "have been given a lengthy discovery period, and the Court has afforded them considerable latitude in exploring avenues of discovery," but plaintiffs failed to show missing documents were "especially fertile ground of relevant evidence"), *aff'd*, 715 F.3d 165 (6th Cir. 2013).

Finally, I am mindful that a non-rebuttable instruction may effectively decide the case in Crown's favor. But Club Car's fault is clear, the prejudice to Crown manifest, and the spoliation total. In these circumstances, Club Car "should bear the risk of prejudice from [its] failure" to

24

preserve the batteries. *Owner-Operated*, *supra*, 860 F. Supp. 2d at 541; *Roth*, *supra*, 2011 WL 1298498, *3 (same).

The only consideration that arguably militates in favor of a lesser sanction is Crown's failure to request production of the batteries earlier in the case, or to exercise its contractual right to inspect the batteries. Had Crown taken either of these steps, the parties likely could have preserved some representative sampling of the batteries.

But I do not place great weight on this omission or find it particularly relevant.

The duty to preserve the batteries was at all times Club Car's duty, not Crown's. At no time before October 22, 2015, moreover, did Club Car disclose that its dealers and customers were destroying the batteries that form the basis of its warranty claims. In fact, Club Car resisted those efforts, and it was uncooperative with Crown's efforts in November, 2015, to preserve whatever batteries may have remained.

The sanction will therefore be a mandatory, non-rebuttable adverse-inference instruction.

25

**Conclusion**

It is, therefore,

ORDERED THAT:

1.      Crown's motion for sanctions (Doc. 127) be, and the same hereby is, granted. Crown is entitled to a mandatory, non-rebuttable adverse-inference instruction directing the jury to find, from the fact of Club Car's spoliation of the batteries, that the batteries failed for a reason that Crown did not warrant against;

2.      Crown shall submit on or before May 16, 2016, a proposed instruction that conforms to this order. The language of the proposed instruction may deviate from the language in the preceding paragraph; and

3.      Each party shall submit, on or before May 16, 2016, a brief stating its position on how this ruling affects the pending motions for summary judgment.

So ordered.

/s/ James G. Carr
Sr. U.S. District Judge

26